DUNBAR–SULLIVAN DREDGING CO. v. TROY & WEST TROY BRIDGE CO.

(District Court, N. D. New York. May 19, 1906.)

NAVIGABLE WATERS—DRAWBRIDGES—COLLISION BETWEEN TOW AND BRIDGE.

On a libel in personam against a bridge company for injuries to a derrick scow in collision with a portion of the draw of a bridge, opened to permit the passage of a tug and tow, evidence *held* to require a finding that the bridge was fully opened, and that the collision was caused by the negligent navigation of the tug in charge of the tow and another tug belonging to libelant while passing through the bridge passage at the same time.

Libel in personam for damages to a derrick scow at Troy, N. Y., by reason of alleged negligence of defendant in not properly opening its bridge, which crosses the Hudson river at that place.

John F. Murray, for libelant Dunbar-Sullivan Dredging Company.

Lewis E. Griffith, for defendant Troy & West Troy Bridge Company.

RAY, District Judge. June 23, 1903, the tug boat Shaun Rhue, owned and operated by the libelant, Dunbar-Sullivan Dredging Company, having lashed to her port side two scows (a dump scow and a derrick scow), the derrick scow outermost, left Green Island in the Hudson river, several hundred feet above and north of the bridge of the defendant, and proceeded southerly, intending to take the scows to Watervliet. The bridge of defendant crosses the river at the city of Troy, and is used as a highway bridge for street cars, trains, and foot passengers. It has a central or pivot pier on which the drawbridge, over 200 feet in length, turns in or near the center of the river, and two other piers also standing in the river—the east and west piers— each distant about 110 feet from this central or pivot pier. When the draw is open there are two passages for vessels—the east and the west passages—each at least 100 feet in width in the clear. Except at very high water it is not necessary to open the draw for the passage of small tugs or low craft. The draw is operated by hand power. Two men can operate it in calm weather, but four are used for the purpose. The ends of the drawbridge when open rest upon or hang over guard piers, one north and the other south of the central or pivot pier. Guard piles extend into the river northerly of the west pier, and also into the river northerly of the north guard pier, on which the end of the open draw rests or over which it hangs when open. From this most northerly center or guard pier guard piles extend along its easterly side to near the pivot pier. Low craft and small tugs can pass under the bridge west of this westerly pier, and

between it and the west end abutment of the bridge. The south end of the west pier is quite a distance north of, or up river from, the southern guard pier, on or over which the south end of the draw, when open, rests or hangs. When open the foot track or walk for foot passengers of the draw extends over or overhangs the water some 8 feet, leaving 100 feet of clear water between the pivot pier and the west pier. On the day in question there was a flood raising the river from 5 to 7 feet. This flood lessened the distance between the surface of the river and the planking of the bridge, but did not interfere with the operation of the tug and scows attached thereto. The tug whistled for the draw to open, which it did, and the tug Shaun Rhue, lashed to the scows, proceeded south to take the west passage. There is a current in the river tending to set craft approaching the west passage over to the west and towards the west pier, but the captain of the Shaun Rhue says that this is met by a counter current from the west, so that there is a good current through the west passage. It is evident from the evidence, and I find that there was no necessity for the tug to voluntarily hug the pivot pier, or crowd to the east and close to the center or pivot pier. Nor was it good or safe navigation so to do, under the circumstances of this case. The tug Shaun Rhue passed into and through the west passage, leaving about 8 feet between the easterly side of derrick scow and the westerly side of the pivot pier. The tug and scows occupied not more than 60 feet in width, leaving all of 30 feet of clear water between it and the west pier. It is contended by the libelant that the draw was not swung fully open, so as to rest on or hang over the southern support or guard pier, but that it was stopped and stood so that it projected diagonally over and partly across the southerly end of the west passage to a distance of from 20 to 25 feet. The libelant further contends that on passing through the west passage the upper end of the mast of the derrick scow was caught in one of the iron parts of the draw so extending over the west passage, and that same was split and broken, and that the scow was otherwise seriously damaged. The claim is that the agents and servants of the libelant were free from negligence or fault, and that the collision and consequent damage were the proximate and necessary results of the negligence of the defendant, by its servants in charge of the draw, in not fully opening the draw.

The defendant insists: First. That it was not in any respect or to any degree in fault or negligent, and that it fully opened the draw in time. Second. That the libelant was the negligent party, and that the Shaun Rhue was crowded or pushed to the eastward while in, or as it was about to enter, the west passage, by another tug (the Spalpeen), also owned and operated by the libelant, and that the mast or derrick of the derrick scow was in this way brought in contact with the overhanging foot walk of the drawbridge, and that the pilot and captain of the Shaun Rhue and the captain of the Spalpeen were both negligent in managing their tugs, and that such negligence was the sole cause of the collision and consequent damage. Third. That, even if the draw was not fully open at the time the Shaun Rhue

passed through the west passage, there was an abundance of room for it to pass. That the captain of that tug saw, before entering the passage, that it was not fully open, and took no measures or pains whatsover to avoid the projecting end or prevent a collision, although he had time, opportunity, and means so to do. That he deliberately, carelessly, and negligently ran upon or against the projecting end of the draw, and that all the damage to the Shaun Rhue was the direct and proximate result of the negligence of those in charge of that tug. The evidence shows and I find that, shortly after or about the time the Shaun Rhue blew for the opening of the draw, the Spalpeen, going up the river from some point below the bridge, passed under it between the west pier and the west abutment, and then turned and ran alongside of the Shaun Rhue for the purpose of transferring some men. It then passed and proceeded on ahead of the Shaun Rhue, and in so doing passed through the west passage. The contention is, and I so find from the evidence, that the draw was promptly swung fully open; that the tug Spalpeen ran alongside of the tug Shaun Rhue just as she was about to enter the west passage, and proceeded by her side and was by her side on the west as she was entering between the center or pivot pier and the west pier, and that the Spalpeen either crowded the Shaun Rhue to the east, or that the Shaun Rhue, to make room in the passage for both tugs and the scows, kept dangerously and unnecessarily to the east, so that the derrick scow was partly under the westerly side of the bridge as its westerly end swung southerly and then easterly in opening, and that in consequence of these careless and negligent movements of the tugs the mast of the derrick scow was brought in contact with the overhanging footbridge of the draw or bridge. Some of libelant's witnesses, who claim to have seen the accident and to have seen the movements of the Shaun Rhue from about the time she left the island until she passed the bridge, make no mention of the Spalpeen, and claim they did not see this tug. Still her captain and others say that she did come north and pass under the bridge west of the west pier, and then turn and go alongside the Shaun Rhue. It is evident these persons who did not see the Spalpeen either were not looking, and did not see what they claim to have seen, or they did not observe the transaction with sufficient accuracy and attention to give reliable testimony. One witness for the libelant, who testified with some detail as to the accident and the manner of its occurrence, and especially as to the alleged fact that the draw was not fully open, testified that the scows were being towed, the one after the other, and this he repeated. At a later date he said he meant the tug Shaun Rhue, and the scows were side by side, the stern of the one being further to the rear or north as they proceeded south than the stern of the other. The evidence of such a witness cannot safely and even properly be relied upon to sustain a finding of negligence on the part of defendant. Several of the persons on the tugs and scows at the time of the accident were not called as witnesses, nor was their absence accounted for. On the other hand, those in charge of the draw, and whose duty it was to operate the bridge, say the draw was fully open. There

was no defect in the draw or the machinery with which it was operated, no wind to impede its opening, and a full crew of four were operating it.

I am fully aware of the libelant's contention that the Spalpeen ran alongside the Shaun Rhue quite a distance above the bridge, and not near the northern entrance to the west passage. I do not think this is the correct version of the transaction. I am satisfied, and find as before stated, that they entered the west passage together. Quite likely the Spalpeen pushed ahead and emerged clear of the piers first. On his own statement the captain of the Shaun Rhue ran into the west passage before the draw was open, and while it was opening, and when at the southerly end it was projecting over the passage about 25 feet or more. He had no difficulty in turning with the scows when up the island, and I am convinced he might have turned, and would have turned before entering the west passage at all, had he, as he claims, seen the draw only partly open, and projecting over the easterly side of the passage. He says, seeing it only partly open and at a standstill, he, with 30 feet of clear water to the west, or on the starboard side, did not sheer to the west, but kept straight ahead until the iron pin on the top of the derrick's mast came in contact with the end of the bridge. Seeing the danger, the overhanging of the bridge, if there was any such condition, and having the ability with a turn of the helm to avoid it, he kept willfully and recklessly on until the damage was done. His statement of the occurrence, his confession of unnecessarily reckless conduct, discredits his entire testimony.

I find that the damage to the derrick scow was caused wholly by the negligence of the captain and the others in charge of the Shaun Rhue in managing that tug with the scows in charge, coupled with the negligence of those in charge of the Spalpeen; in short, by the negligence of the libelant itself, and that the defendant was free from any fault or negligence whatever that in any way or degree contributed to or produced the collision and consequent injury.

There will be findings and a decree accordingly, dismissing the libel, with costs.